UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:06-CV-162-H

ACUITY INSURANCE COMPANY                                          PLAINTIFF

V.

HIGDON'S SHEET METAL AND SUPPLY CO., INC., et al.            DEFENDANTS

**MEMORANDUM OPINION**

Plaintiff Acuity Insurance Company ("Acuity") has brought a declaratory action to

determine who must defend and indemnify Higdon's Sheet Metal & Supply Co., Inc.

("Higdon's") in an underlying negligence action arising from a 2005 fire at a restaurant upon

which Higdon's performed work in 1999.  Several of the parties have filed motions which the

Court will now consider.

I.

The pertinent actors in this controversy are as follows:

1.        Tumbleweed operates a restaurant which caught fire in 2005.

2.        Continental Western Insurance Company ("Continental") issued property

insurance to Tumbleweed; paid the property claims; and has brought a subrogation action (as

subrogee of Tumbleweed) against Higdon's Sheet Metal and Supply Company in a related case

in this Court.  Continental is not a party to this action.

3.        Higdon's Sheet Metal and Supply Co., Inc. ("Higdon's") is a subcontractor who

installed equipment at Tumbleweed in 1999, which is blamed as a partial cause of the fire.

Highdon's is a defendant in this action as well as in the subrogation action.  It has brought several counterclaims and cross claims and now moves for leave to file its First Amended Cross Claim against CNA and Continental.

4.      Union Standard Insurance Company is an insurance company which says that Continental, not itself, issued the Tumbleweed policy.  On March 2, 2007, it moved to dismiss the claims against it.  That motion is not submitted.

5.      Acuity Insurance Company ("Acuity") provided liability coverage to Higdon's in 2005 and is currently defending Higdon's in the related subrogation action.  In this action it seeks to void its coverage of Higdon's and its obligation to defend Higdon's in the related action.

6.      Transcontinental Insurance Company ("Transcontinental")/CNA Insurance Company, Ltd. ("CNA") (collectively "Transcontinental") insured Higdon's, provided liability insurance to Higdon's in 1999 and seeks to avoid any coverage now.  Transcontinental has moved to dismiss all the claims by Higdon's and Acuity against it.

7.      Sterling G. Thompson ("Sterling Thompson") is an agency that sold the 2005 Acuity policy to Higdon's.  Higdon's seeks indemnity from Sterling Thompson in the event that either Acuity or CNA, or particularly both of them, succeed in avoiding coverage.  Sterling Thompson has moved to dismiss or, in the alternative, stay proceedings against it by Higdon's.

8.      Wessel Insurance Agency ("Wessel") is an insurance agency that sold Higdon's the 1999 Transcontinental policy.  Higdon's seeks the same indemnity from Wessel as from Sterling.  Wessel has moved to dismiss all the claims against it.

II.

2

In 1999, Higdon's installed hoods and performed ductwork at a Tumbleweed Restaurant. At the time of the construction and installation performed at Tumbleweed in 1999, Higdon's had a general liability policy with Transcontinental, which expired on January 31, 2002. When Higdon's obtained the Transcontinental policy, its insurance agent was Third Party Defendant Wessel.   Wessel's agency agreement with Wessel was terminated November 2001.[1]

On or about March 8, 2005, a fire damaged the restaurant, and Higdon's was one of several parties subsequently sued in a subrogation suit by Tumbleweed's insurer.  At the time of the fire in 2005, Higdon's had an active general liability policy with Acuity.  When Higdon's obtained the Acuity policy, its insurance agent was Third Party Defendant Sterling Thompson.

Higdon's learned of the fire on March 14, 2005.  Shortly thereafter, it notified its former insurance agent, Wessel, of the upcoming investigation.  Higdon's contends that Wessel advised Higdon's that its loss should be covered by Transcontinental and assured them that the claim was being processed.  Although it is disputed whether Theresa Wessel Young actually communicated to Higdon's that Wessel no longer represented Transcontinental, Young advised Higdon's Office Manager, Wanda Higdon, to notify Higdon's current carrier of the potential claim.[2]  Higdon's did so by providing notice to its current insurance agent, Sterling Thompson.

One week after having received notice of the loss, on March 23, 2005, Wessel notified Transcontinental by fax via the First Notice System.  This notice was sent on the same day as a cause and origin investigation at the restaurant that Higdon's attended unrepresented.

[1] This is even before Higdon's policy with Transcontinental terminated on January 1, 2002.

[2] A handwritten note dated 3-16-05 on the Acord General Liability Notice of Occurrence/Claim reads, "Advised Wanda [Higdon] to report to current carrier as well."  (Wessel Mem. Supp. Summ. J. Ex. B).  Higdon's has admitted that Wessel twice advised Higdon's to give notice to its current carrier as well as CNA [Transcontinental] on March 16, 2005 and again on October 17, 2005.

3

Transcontinental apparently failed to communicate promptly to Higdon's its receipt of or decision as to the restaurant fire.  An Acknowledgment of New Claim was issued to Higdon's in May 2006, over a year after Transcontinental received the claim.  It is not clear when Transcontinental finally notified Higdon's that it did not consider its claim covered, but it issued a letter stating as much on August 8, 2006, over four months after the initiation of this litigation.

Acuity alleges that it did not receive notice of the claim until February 2006, almost a year after the fire occurred.  The underlying subrogation suit was filed in October 2006.[3]  Acuity currently defends Higdon's in that suit.  The underlying subrogation action is proceeding concurrently and has been referred to a magistrate judge for mediation.

III.

Defendants CNA and Transcontinental move for summary judgment as to Acuity's complaint and Higdon's cross claim.  The duty to defend and indemnify will depend on (1) whether Higdon's insurance policies with the parties actually applies to the subject damage at issue in the subrogation action and (2) whether some legal theory such as estoppel can be used against CNA and Transcontinental for failure to deny coverage to Higdon's in a timely fashion. The Court finds that neither theory succeeds.

A.

As a preliminary matter, there appears to be some confusion as to the role of CNA. Defendants state that CNA Insurance Company, Ltd. is a foreign corporation that does not conduct any business in the United States, has no agent for service of process in the United

---

[3] *Continental Western Ins. Co. v. Commercial Services Inc., et al.*, No. 3:06CV-529-H (W. D. Ky. filed Oct. 16, 2006).

States, did not issue a general liability policy to Higdon's, and was improperly included in this litigation.  They explain that there is a trade name of CNA Financial, commonly referred to in the insurance industry as "CNA", but it is an umbrella for over twenty underwriting companies and does not issue insurance policies.

Frustratingly, no party responds to this contention, yet Acuity and Higdon's continue to lump CNA and Transcontinental together as "CNA" in their responses.  Furthermore, many of the documents from the insurer to Higdon's are typed on CNA letterhead or specifically refer to CNA Insurance.[4]

At this time, there is still a question of fact as to the role of CNA and its relation to Transcontinental.  CNA has not moved to dismiss for lack of personal jurisdiction, and that argument may have already been waived.  For purposes of this opinion and order, CNA and Transcontinental shall be treated together and referred to as Transcontinental.

B.

Transcontinental argues first that its policy does not apply to the Tumbleweed fire of March 8, 2005, because its insurance policy with Higdon's expired January 31, 2001.  Acuity and Higdon's respond that since the alleged negligent construction that caused the resulting damage occurred within the policy period, the Transcontinental policy applies.

---

[4] An April 5, 2006 letter from Theresa Young at Wessel to Higdon's counsel states that it encloses a copy of Higdon's policy that was written with "CNA Insurance".  The attached policy, which has a policy period from 01/31/1999 to 01/31/2002, is on CNA letterhead even though it states that coverage is provided by Transcontinental Insurance Co.  (Higdon's Obj. Prop. Agreed Ord., Ex. 1.)  Similarly, a policy certification from George G. Moore, an agent of Transcontinental Insurance Co., is on CNA letterhead.  (Transcontinental Mem. Supp. Summ. J., Ex. 1.)  The  May 18, 2006, Acknowledgment of New Claim signed by David A. Petrovic and the August 8, 2006, letter to Higdon's stating that Transcontinental had denied the claim were both on CNA letterhead.  (Acuity Response to Transcontinental Motion Summ. J., Petrovic Dep., Ex. 16.)  Moreover, the Notice of Loss filed with the Claims Department from First Notice Systems has a heading of C N A Commercial.  (Acuity Response to Transcontinental Motion Summ. J., Petrovic Dep., Ex. 16.)

Although some states have adopted a coverage trigger theory to establish the date of loss for determining when coverage is triggered in cases such as this, Kentucky has not done so. *See Eckstein v. Cincinnati Ins. Co.*, No. Civ. A.505CV043M, 2005 WL 3050469 at *2 (W.D. Ky. Nov. 14, 2005) (refusing to adopt either the "manifestation" theory or the "continuous trigger" theory in the absence of guidance from the Kentucky Supreme Court). Instead, coverage is determined by examining the terms of the policies at issue. *Id.* at *3.

Acuity and Higdon's both argue that the Transcontinental policy is ambiguous in this case because the allegedly negligent construction performed by Higdon's could be construed as an "occurrence" covered by the policy. The Commercial General Liability Coverage Form explains that the Transcontinental insurance policy applies only if: "(1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and (2) The 'bodily injury' or 'property damage' occurs during the policy period." (Transcontinental Mem. Supp. Summ. J., Ex. 2, p.1.) Acuity and Higdon's emphasize the policy's definition of "occurrence", which means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Transcontinental Mem. Supp. Summ. J., Ex. 2, p.10.) They argue that the damage caused by Higdon's alleged negligence could be considered continuous since 1999 and thus should be covered by the Transcontinental policy. This argument is not enough to help Acuity and Higdon's.

Even if the negligent action is continuous and thus meets the definition of an "occurrence" under the policy, Acuity and Higdon's ignore the second prong of the test for coverage: that the bodily injury or property damage occur within the policy period. The policy period ended January 31, 2002, and the property damage at issue was the result of a March 8,

2005 fire.  The Transcontinental policy unambiguously does not apply to damage resulting from a fire occurring over three years after the policy period ended.

Nor are Acuity and Higdon's arguments saved by their reliance upon *James Graham Brown Found., Inc. v. St. Paul. Fire. & Marine Ins. Co.*, 814 S.W.2d 273 (Ky. 1991).  In *James Graham Brown*, the issue was whether environmental damage constituted an "occurrence" under several insurance policies.  The insurers argued that the policies did not apply because the damage had been foreseeable and thus not accidental.  The court disagreed, holding that environmental damage qualified as an occurrence because even though it may have been foreseeable, it was not intended or expected.  This case does not help Acuity or Higdon's.

No party to the present case has argued that the Tumbleweed fire was intended or expected, so the holding in *James Graham Brown* is uninstructive in this case.  Regardless, the *James Graham Brown* court noted that under the terms of the policy in that case the property damage must occur during the policy period: "The occurrence need not take place and no claim need be filed during the period the policy is in effect.  An event that qualifies as an occurrence must either cause property damage or bodily injury during the period of time the policy is in effect."  *Id.* at 277.  Thus, under both a plain reading of the Transcontinental policy and the *James Graham Brown* case, the Transcontinental policy does not apply to property damage occurring outside the policy period.  In the absence of a contractual obligation in an insurance policy for coverage, Transcontinental owes no contractual duties to Acuity or Higdon's and cannot be liable for bad faith.  *Kentucky National Insurance Co. v. Shaffer*, 155 S.W.3d 738, 742 (Ky. Ct. App. 2004).

C.

Acuity and Higdon's next argue that even if the Transcontinental policy does not apply on its face to the damage resulting from the Tumbleweed fire, estoppel should be used to force Transcontinental to cover the damage.  The elements of estoppel are as follows:

> (1) Conduct, including acts, language and silence, amounting to a representation of material facts; (2) the estopped party is aware of these facts; (3) these facts are unknown to the other party; (4) the estopped party must act with the intention or expectation his conduct will be acted upon; and (5) the other party in fact relied upon this conduct to his detriment.

*Gray v. Jackson Purchase Credit Ass'n*, 691 S.W.2d 904, 906 (Ky. Ct. App. 1985).  Acuity and Higdon posit that Transcontinental had made a determination that there was no policy in effect in March 2005 but failed to convey such information to Wessel or Higdon's for seventeen months and until after this declaratory action was filed.  Since Higdon's had no notice of the determination, it did not seek other coverage.  Thus, the argument goes, Acuity was notified late and its defense of Higdon's was prejudiced.

Whether Acuity or Higdon's actually suffered prejudice as a result of Transcontinental's actions is doubtful.  Transcontinental did not have notice of the claim prior to the March 23, 2005, cause and origin investigation of the fire.[5]  Without notice prior to the cause and origin investigation, no action on its part could have affected whether Higdon's attended the investigation unrepresented.  Since Transcontinental had no notice of the claim prior to the cause and origin investigation, it is unclear to the Court how else either Acuity or Higdon's could have been prejudiced by Transcontinental's actions, especially since Sterling Thompson had also been

---

[5] The cause and origin investigation took place March 23, 2005, at 9:00 a.m., EST.  Transcontinental did not receive notice of the investigation until noon that day, when a fax was sent from First Notice Systems, an intermediary company that receives notices of claims and forwards them to the proper insurance carrier. (Transcontinental Reply Summ. J., Ex. 2-3)

notified of the Tumbleweed fire.  Moreover, Acuity was notified of the claim prior to the filing of the underlying subrogation case.

Acuity and Higdon's cite a total of six cases in support of this novel theory that insurance coverage should be extended beyond the policy period in direct contradiction to the plain language of the policy.  None of the cited cases convince the Court that estoppel is appropriate in this case.

In *Howard v. Motorist Mutual Ins. Co.*, 955 S.W.2d 525 (Ky. 1997), the court used estoppel to prevent an automobile insurer from denying coverage after cashing the insured's check in payment of a late premium, when the insurer had accepted similar late payments in the past.  The plaintiff relied upon the fact that the check had been cashed and began driving her vehicle, which she assumed to be insured.  Two weeks after cashing the check, the insurer attempted to refund the premium and refuse to renew the policy.  In the interim, the plaintiff had an accident.  The court found that based on their prior course of conduct the insurer was estopped from arguing that no policy existed.

The *Howard* case is wholly inapplicable to the situation at bar.  The *Howard* case was about reliance upon a course of dealing.  The insurer "engaged in a course of dealing where it repeatedly accepted late premiums, even if the policy had lapsed, and issued Appellant retroactive coverage.  By cashing Appellant's check and retaining the money for two weeks without informing her of the conditional nature of the acceptance, [the insurer] concealed material facts of which it was uniquely aware."  *Id.* at 529.  Subsequent cases dealing with acceptance of late premiums have distinguished themselves from the unique factual situation of *Howard*.  In *Kinslow v. Hartford Ins. Co. of the Midwest*, No. 2003-CA-001426-MR, 2004 WL

9

1230086 (Ky. Ct. App. 2004), the insureds mailed their premium payment after receiving notice of cancellation of their homeowners' policy, just as in *Howard*.  However, because this was only the first time the insurer had attempted to continue the policy after notice of cancellation, the Court permitted the insurer to refuse to reinstate the policy.  Because there had been no prior course of conduct of applying late payments retroactively, estoppel did not apply.

The next case cited by Acuity, *Gray v. Jackson Purchase Credit Ass'n*, 691 S.W.2d 904 (Ky. App. 1985), is similarly inapplicable.  First of all, the case concerns a judgment on a delinquent note and foreclosure on secured property; it does not involve the creation of an insurance contract where one does not exist.  In *Gray*, a debtor was attempting to claim that he had never received proper service in a foreclosure proceeding, and that the return of service was signed by his son.  The Court found that in fact the son had held himself out to be his father throughout the entire course of dealings with the parties and had signed every other document. The misleading conduct in the course of dealings prevented the father from claiming that the foreclosure was improper simply because the proof of service had been signed by his son.  To dismiss the case for lack of service of process would cause the opposing party to suffer an obvious detriment, and so the father was estopped from denying the validity of service.

The only other case involving Kentucky law relied upon by the parties is *Hazard Coal Corp. v. Kentucky West Virginia Gas Co., LLC.*, 311 F.3d 733, 740-741 (6th Cir. 2002), a land lease and easements case about "waiver by acquiescence" rather than estoppel.  Waiver and estoppel are distinct legal principles.  Although waiver and estoppel "are misused and interchanged, there truly is a clear distinction between them.  Waiver is bottomed on a voluntary and intentional relinquishment of a known, existing right or power under the terms of an

insurance contract... Estoppel gives no effect to presumed intention, but defeats inequitable conduct. It offsets misleading conduct, acts, or representations which have induced a person to rely thereon to change his position to his detriment." *Edmondson v. Pennsylvania Nat'l Mutual Cas. Ins. Co.*, 781 S.W.2d 753, 755 (Ky. 1989). In *Hazard Coal Corp.*, the plaintiffs had acquiesced in the defendant's practice of transporting an affiliate's gas through its pipelines, and the court found that such practice waived its ability to challenge the practice. The equitable remedy employed by the court in that case is wholly inapplicable to the facts of this case and does not present an argument for applying estoppel against Transcontinental.

The remaining two cases cited by Acuity and Higdon's, *United National Ins. Co. v. SST Fitness Corp.*, 309 F.3d 914 (6th Cir. 2002) and *Allstate Ins. Co. v. Fox*, C.A. No. 134, 1990 WL 8058 (Tenn. App. 1990), do not involve Kentucky law and are unpersuasive in this case. Neither involves the creation of insurance coverage outside the policy period.

For unknown reasons, Transcontinental failed to communicate promptly to Wessel or Higdon's its decision as to the Tumbleweed fire claim. However, since Transcontinental had received the information after the cause and origin investigation, any delay on the part of Transcontinental could not have affected whether Higdon's attended the investigation unrepresented. Moreover, Higdon's was advised by Wessel to notify its current carrier, which it apparently did. Thus, any detriment to Higdon's would have been remedied by proper action on the part of its current carrier. The Court will not apply the equitable doctrine of estoppel against Transcontinental in such circumstances.

III

Higdon's has cross-claimed against Wessel for breach of contract, breach of fiduciary

11

duties, and professional negligence.  Specifically, Higdon's alleges that Wessel (1) neglected to provide proper notification to Transcontinental of Higdon's claim, (2) failed to properly manage the claim, (3) failed to properly advise Higdon's as to the proper means of perfecting notification of claims, (4) failed to properly advise Higdon's as to interpreting coverage questions in its respective policies, and (5) failed to provide Higdon's with proper notification of a timely denial of coverage by Transcontinental.[6]

A.

As a preliminary matter, there is considerable debate among the parties as to whether any duty existed between Wessel and Higdon's.  The question of an insurance agent's duty is one of law, and essentially involves a policy determination by the court.  *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 248 (Ky. 1992).  Wessel argues that as a former agent it had no duty--contractual, fiduciary, or otherwise--to monitor Transcontinental's claims processing or advise its former client Higdon's of the applicability of insurance policies.  Wessel is partly right.

Wessel cannot be liable to Higdon's for breach of contract because no contract, either express or implied, existed in 2005.   Higdon's identifies no written or verbal agreement with Wessel.  Nor does the Court find an implied contract.  In Kentucky, a contract may be implied in law or in fact.  *Perkins v. Daugherty*, 722 S.W.2d 907, 909 (Ky. App. 1987).  A contract implied in law allows for recovery in *quantum meruit* for unjust enrichment.  *Id.*  A contract implied in fact is a "true contract, shown by evidence of facts and circumstances from which a meeting of the minds concerning the mutual promises may be reasonably deduced."  *Id.* (citing *Thompson v.*

---

[6] Even though the Court has already determined in the preceding section of this Memorandum that Transcontinental is not liable to Higdon's under the terms of its policy or under a theory of estoppel, it remains possible, though unlikely, that Wessel may have some independent liability.

*Hunter's Ex'r.* 269 S.W.2d 266 (Ky. 1954)).  The Court finds neither form of implied contract present here that would impose duties asserted by Higdon's.  Whether at the time Higdon's first purchased its policy through Wessel, or more recently when Higdon's contacted Wessel with notice of the subject fire loss, there is no evidence that either party agreed to be legally bound to accept these alleged duties, and no consideration for them is alleged.  *See BDT Products, Inc. v. Lexmark International, Inc.*, 274 F.Supp.2d 880, 887 (E.D. Ky. 2003).

It follows naturally that Wessel had no fiduciary duty to Higdon's.  A fiduciary duty creates the highest order of duty imposed by law, *see In re Salle v. Fort Knox National Bank*, 286 F.3d 878 (6th Cir. 2002), but the Court finds and the parties cite no published Kentucky case that applies this standard to an insurance agent's relationship with an insured.  A *former* insurance agent certainly has no fiduciary duties to a former insured.

B.

Higdon's third cause of action is for professional negligence.  Despite having no contractual or fiduciary duty to Higdon's, Wessel could have a statutory and common law duty upon which a negligence action is based.

First, Wessel had a statutory duty to act reasonably promptly with respect to its handling of the notice of loss from Higdon's.  Ky. Rev. Stat. Ann. § 304.12-230(2) (2007).  Kentucky's Unfair Claims Settlement Practices Act ("UCSPA") prohibits any person from "failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies."  *Id*.

Given Wessel's duty to act reasonably promptly, the Court must next consider whether such duty was breached.  Wessel submitted notice of the subject fire loss to the insurer seven

13

days after receipt.  It twice reminded the insurer in writing to contact Higdon's directly as soon as possible because Wessel no longer represented either.  It also advised Higdon's at least twice to submit notice of the potential claim to its current insurance carrier.  It is difficult for this Court to see how Wessel could have been expected to do more.

Wessel did not breach his statutory duty to act reasonably promptly with respect to its handling of the notice of loss from Higdon's.  Wessel notified Transcontinental of the potential claim on March 23, 2005, just seven days after receiving notice itself.  Insurers must acknowledge receipt of a notification of claim within fifteen days.  *See* 806 Ky. Admin. Regs. 12:095 §§ 5-6.  Wessel's communication with Transcontinental was well within that period and provided them with plenty of time to notify Higdon's within the fifteen day period.[7]  The fact that such notification was not made by Transcontinental for over a year suggests that the seven day delay had little effect on when Higdon's was actually notified.  Furthermore, the fact Wessel notified Transcontinental on the very day a cause and origin investigation as to the restaurant fire had been scheduled is irrelevant.  Wessel specifically advised Higdon's to notify their current carrier, which it did.  Wessel's forwarding of a notice of inspection to its former principle was thus reasonably prompt as a matter of law.

Despite the duty to acknowledge and act reasonably promptly upon communications,

---

[7] In Kentucky, failure on the part of a claimant to provide prompt notice of a claim to an insurer can defeat liability insurance coverage upon a showing of probable prejudice.  *See Jones v. Bituminous Casualty Corp.*, 821 S.W.2d 798 (Ky. 1991) (remanding to lower court for a finding of whether six and a half month delay in notifying insurer resulted in probable prejudice).  Moreover, this Court has held that an insurance company did not face prejudice from late notification when notice was provided within twelve days.  *See Charter Oak Fire Ins. Co. v. Coleman*, 273 F.Supp.2d 903, 907-08 (W.D. Ky. 2003).  In the current case, the insurer was provided notice from Wessel within seven days of the insurance agent having received it.  Had Wessel been the insured rather than a former insurance agent, it is unlikely that a Kentucky Court would have found a one week delay prejudicial.  Viewing this case by analogy is instructive in considering whether Wessel's notification to Transcontinental was reasonably prompt.

Wessel did not have a statutory duty to provide Higdon's with proper notification of a timely denial of coverage by Transcontinental.  The relevant provision of the UCSPA broadly applies to "any person", which includes an insurance agent.  The regulations clarifying the statute do not. *See* 806 Ky. Admin. Regs. 12:095 §§ 5-6 (2007).  They specifically require an *insurer* to acknowledge receipt of a notification of claim within fifteen days and affirm or deny any liability on claims "within a reasonable time".  *Id.*  Such a requirement is noticeably absent for insurance agents, who have no control over the coverage decisions of the insurer.

C.

Higdon's further allegations suggest that Wessel had a duty to advise Higdon's as to notification procedures and coverage.  Kentucky Courts have been hesitant to impose upon an insurance agent a duty to advise.  In *Eastham v. Stumbo*, 279 S.W. 1109 (1926), the court held that an insurance agent had no duty to notify a policyholder of the insurer's insolvency, absent proof that the agent knew the insurer was insolvent when the policy was issued and made fraudulent representations to the policyholder.  *Id.* at 1110.  The Kentucky Supreme Court has held that an insurance agent had no affirmative duty to advise an insured about the availability of optional underinsured motorist coverage, when the agent did not represent that advice would be given, no amount was paid beyond the insurance premium to obtain such advice, there had been no long-term course of dealing with the agent, and the insured did not expressly ask for advice. *Mullins*, 839 S.W.2d at 248.

Other courts have found that a special relationship can create a duty to advise on the part of an insurance agent.  *See, e.g., Hardt v. Brink*, 192 F.Supp. 879, 880 (W.D. Wash. 1961) (holding an insurance agent liable for failure to advise client to insure against a potential liability

15

when the agent held himself out as a highly skilled insurance advisor and specialist and whom the insured had relied upon for such advice).  Although no such additional duties have been imposed upon insurance agents in Kentucky, Transcontinental argues that Wessel may have voluntarily assumed such duty.  Generally, "a breach of a voluntarily assumed duty can give rise to tort liability."  *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 230 S.W.2d 103, 105 (Ky. 1950) (citing *Louisville Cooperage Co. v. Lawrence*, 230 S.W.2d 103, 105 (Ky. 1950)).  A threshold inquiry is whether the tortfeasor had actually and specifically undertaken to render the services allegedly performed without reasonable care.  *Id.* (citing *Good v. Ohio Edison Co.*, 149 F.3d 413, 420 (6th Cir. 1998)).  As noted by the court in *Carneyhan*, Kentucky courts imposing tort liability for the breach of a voluntarily assumed duty have been consistent with the threshold requirement.  *See, e.g., Johnson v. Brey*, 438 S.W.2d 535, 536 (Ky.1969) (defendant voluntarily undertook to hold back a branch as plaintiff passed by); *Louisville Cooperage Co. v. Lawrence*, 230 S.W.2d 103, 104 (Ky. 1950) (defendant voluntarily undertook to keep wood shavings wet at all times; breach of this agreement caused fire); *Estep v. B.F. Saul Real Estate Inv. Trust*, 843 S.W.2d 911, 914 (Ky.App.1992) (defendant voluntarily undertook to clear its parking lot and sidewalks of snow).  Transcontinental argues that Wessel voluntarily assumed the duty to advise Higdon's when it told Higdon's that the Transcontinental policy applied and it would find out who it should contact at Transcontinental.

Although the Court finds no Kentucky case applying such a principle against a former insurance agent, a New York state case utilized a similar tool when faced with a situation that closely resembles the current dispute.  *See Gen. Sportwear Co. v. Case*, 158 A.D.2d 884 (N.Y. App. Div. 1990).  In *Case*, when the plaintiff discovered that it was without insurance coverage

for a claim in an underlying personal injury suit, it sought recovery from its former insurance agents. *Id.* at 885.  The insurance agents had told the plaintiff that the insurer had undertaken the claim. *Id.*  The plaintiff alleged that the insurance agents had negligently failed to diligently review and properly handle the claim. *Id.*  The court held that by representing to their former insured that a defense of claim had been undertaken, the insurance agents created a duty to use reasonable care to ensure that the uninsured's interests were protected, even though the claim occurred outside the coverage period of the policy. *Case*, 158 A.D.2d at 885.

As in *Case*, Wessel may have assumed a duty to use reasonable care to ensure that the uninsured's interests were protected.  Unlike *Case*, Wessel informed the insurer of a potential claim within seven days, reminded it in writing to contact Higdon's directly, and twice advised Higdon's to contact its current insurance carrier.  It is not clear to this Court what more Wessel could have done to protect Higdon's interests.  Higdon's alleges that Wessel advised it that its loss should be covered by the Transcontinental coverage and assured them that the claim was being processed.  However, any prejudice Higdon's would have faced by relying on any representation by Wessel that the Transcontinental policy applied would have been alleviated when it contacted its current carrier, which could have made a decision as to whether its own policy applied.  Its communications with Transcontinental and Higdon's certainly satisfy any duty of reasonable care that its actions may have created.

IV.

Higdon's has filed a Motion to Leave to file its First Amended Cross Claim against Transcontinental.  The first amended cross claim adds negligence and negligence per se claims based on alleged violations of 806 Ky. Admin. Reg. 12:095, § 5.  Transcontinental opposes the

17

Motion on the ground that the claims are speculative and Higdon's has suffered no actual damages.

The Court has already dismissed the primary claims against Transcontinental.  Moreover, the Court has also dismissed claims against Wessel, which acted as Higdon's agent for the purchase of the Transcontinental policy.  Under these circumstances, it appears unlikely that Transcontinental could have actual liability in negligence to Higdon's.  Even if it did breach a duty, it is difficult to see that Higdon's has been damaged.  Whether such claims are viable is more properly decided after arguments are made on a motion to dismiss or summary judgment. The claims were timely filed, and they are not so frivolous as to be denied the opportunity to be argued before this court.  Leave shall be freely given to amend a party's complaint when justice so requires.  Fed. R. Civ. P. 15(a).

The Court will permit the amended cross claim only to the extent of the negligence and negligence per se claims based upon violation of a state regulation.  All other prior claims have been dismissed as described in Section II of this Memorandum.

V.

Higdon's has filed a third party complaint against Sterling Thompson for breach of contract, breach of fiduciary duties, and professional negligence.  Sterling Thompson now moves to dismiss or, in the alternative, stay proceedings filed against it by Higdon's.

This is a coverage case to determine which insurer bears the burden of defending and indemnifying the claimant, Higdon's.  Sterling Thompson is the insurance agent that sold Higdon's its Acuity insurance policy.  Higdon's cross-claim seeks indemnification from Sterling Thompson if either of the insurers are found to be free from duties to defend or indemnify

18

Higdon's.  Sterling Thompson argues that since its exposure to liability is contingent upon a finding that neither insurance company is liable, no actual controversy exists involving it, and the claims against it are not ripe for adjudication.  The Court agrees.

Higdon's alleges that it timely notified Sterling Thompson of the 2005 fire.  Sterling Thompson may have had a duty to notify Acuity in a timely fashion, or notice to Sterling Thompson as agent may be considered constructive notice to Acuity as principal.  The Court has yet to consider these issues.  Regardless, Sterling Thompson's liability to Higdon's will only arise if there is a finding that Acuity need not indemnify Higdon's.  Only then could Sterling Thompson face potential liability.  The Court has supplemental jurisdiction over the claims.  *See State Nat'l Ins. Co., Inc. v. Yates*, 391 F.3d 577, 579 (5th Cir. 2004) (finding supplemental jurisdiction for counterclaims brought by claimant against insurance agent for negligence and negligent misrepresentation in similar coverage suit initially brought by insurer).  However, such claims need only be addressed if Acuity actually escapes liability.

The Court will issue an order consistent with this Memorandum Opinion.

cc:      Counsel of Record

19